UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LANCE T. CHRISTIE,
    *Plaintiff*,
    *v.*
JASON PRESCOTT,
    *Defendant*.

Civil No. 3:14-cv-566 (JBA)

December 8, 2016

**Memorandum of Decision**

Plaintiff Lance T. Christie ("Plaintiff" or "Mr. Christie") brings this action against Defendant Waterbury Police Officer Jason Prescott ("Defendant" or "Officer Prescott"), alleging that the Defendant used unreasonable force against him in the course of an arrest in violation of his Fourth Amendment rights. (*See* Compl. § 10 [Doc. # 1].) The Court held a one-day bench trial to address Plaintiff's claim.

For the reasons articulated below, the Court concludes that the evidence of liability is in equipoise and thus Plaintiff has not satisfied his burden of proving by a preponderance of the evidence that Defendant used excessive force during the course of arresting him in violation of his Constitutional rights. On the evidence presented, the Court concludes that it is equally likely that Officer Prescott struck Plaintiff on the head with a hard object, as Plaintiff claims, as it is that Plaintiff slipped and fell, cutting his head open in the process.

The recital of facts in this case is necessarily brief due to the paucity of evidence presented at trial. Each party relied on only his own testimony. In that testimony, each party presented divergent accounts of the encounter giving rise to Plaintiff's claim, and each omitted salient details from his account. This lack of detail, along with the absence of expert testimony about the nature

and causation of Mr. Christie's wound, resulted in Mr. Christie's inability to meet his burden of proof.

## I. Background

While the parties generally agree on many of the background facts, their accounts of the circumstances and sequelae of the arrest were in sharp contrast. Accordingly, the Court first sets forth the facts on which the parties agree and then the two competing versions of the arrest, as well as a synopsis of the documentary evidence submitted. Against this background, the Court explains its findings of fact and conclusions of law.

### A. The Parties

Plaintiff Lance T. Christie is a forty-five year-old father of one from Bridgeport, Connecticut who, at the time of his arrest, was a resident of Waterbury, Connecticut.

Defendant Jason Prescott is an officer at the Waterbury Police Department in Waterbury, Connecticut. At the time of the incident, he had been employed by the Waterbury Police Department for approximately two years and remains employed there today.

### B. The Events of October 30 and 31, 2011

#### 1. Uncontested Facts

On October 29, 2011, an unseasonably early blizzard struck parts of Connecticut, including Waterbury, causing widespread power outages and resulting in streets that were unlit and deep with snow. By the night of the arrest, the streets had been plowed, and there were piles of snow and detritus along the edge of some roadways, including near where the arrest took place.

Around midnight on October 30-31, 2011, Officer Prescott was dispatched to investigate a female tenant's complaint of a disturbance in front of her apartment complex. Officer Prescott drove to the apartment complex and spoke with the complainant. In his testimony, Officer Prescott

offered few details concerning the nature of the complaint and no details regarding the description of the suspect given to him; he stated only that the complainant, a mother with a young child, had become frightened because of a man yelling in the street near her apartment. After speaking with the complainant, Officer Prescott set out in his police cruiser to search the neighborhood.

That same night, Mr. Christie left a friend's house on foot for the nearby 7-Eleven because it was the only store with power in the area. Some one- or two-hundred yards beyond the Diamond Court condominium complex,[1] Officer Prescott spotted Mr. Christie and pulled up behind him because he matched the complainant's description. Officer Prescott stepped out of his police cruiser to ask Mr. Christie some questions.

Although both Plaintiff and Defendant agree that Officer Prescott drove up to Mr. Christie while he was walking down the street, the details of the interaction are in dispute. The parties agree that Defendant's police cruiser pulled toward Mr. Christie (though neither made clear if Officer Christie approached from behind or from the front), and the parties agree that a strong light was shone in Mr. Christie's face. The parties agree that Officer Prescott stepped out of his car. However, the course of events after that point is in dispute. There were inconsistencies in both parties' accounts that appeared not solely attributable to the frailty of human memory and which had the effect of undermining the credibility of both testifying witnesses.

　　2.　Plaintiff Lance Christie's Account

Mr. Christie testified plausibly that, while he remembered the night of October 30-31 "clearly," he was unsure of certain details and did not remember everything exactly. Later in his

---

[1] Testimony at trial did not make clear if this was the apartment complex in which the complainant lived.

testimony, he explained that he could not remember precisely the timing of events that had occurred "six years ago, five years ago."[2] Mr. Christie testified that it was pitch black when he set out for 7-Eleven because of the power outage. As he walked down the street, he heard a screech of tires and so he turned his head toward the sound. When he looked toward the approaching car, he was blinded by a light so bright he could not see past it to recognize the vehicle as a police cruiser, and so he raised his hands to shield his eyes.

Mr. Christie's account emphasized the speed and immediacy of events, but on retelling, he conceded that the arrest unfolded more slowly. Initially, he testified that the first thing he remembered after being blinded by the bright light was being tackled. He did not recall seeing flashing lights or hearing a siren. Rather, he remembered someone stepping out of the passenger side of the car as he shielded his eyes from a blinding light, and being taken down from the side. On the stand, Mr. Christie demonstrated how he held up his hands to shield his eyes from the light. He did not remember moving or walking away when the officer drove up, only standing still and facing into the light when he was tackled. "I just saw the light shine on me and I was like I didn't know what was going on. And then, I was on the ground. The guy was like, he grabbed me, he threw me on the ground." In the first telling, he insisted that the police officer did not say anything, but simply shone a light in his eyes and tackled him.

---

[2] Mr. Christie's testimony was marked by a candid willingness to state that certain details had faded in his memory. Some of these holes in his memory may be explained by lack of adequate preparation for trial. Mr. Christie was evidently surprised that his trial date had arrived. He testified that he was prepared to bring his psychiatric records to court, but that he "had no idea today was going to be the trial." This evident surprise reflected lack of communication between Mr. Christie and his counsel and a concerning lack of trial preparation on the part of Mr. Christie's counsel.

Later, Mr. Christie added that before he was tackled, the officer "said something like get on the ground or turn around . . . . Like, don't move, don't move, you're under arrest" but that he did not have time to give a response, because he was tackled from the side while he was still unsure who was speaking to him. Because he could not see who his assailant was, he twisted away as he was being tackled and landed face first on the ground with his assailant on his back.

Mr. Christie further testified that, after he was on the ground, the arresting officer struck him on the head three or four times with a hard object. Mr. Christie could not tell what the object was because it was too dark and he was face down. When asked if he passed out, Mr. Christie testified that "I don't think I lost consciousness . . . . I just saw stars, and then the next thing you know, I was inside the cop car."

Pressed to recount with more detail, Mr. Christie testified that he was handcuffed while on the ground and then was stood up by the officer who placed the handcuffs on him. While he was lying on the ground, Mr. Christie asked the officer what happened and the officer responded, "You're under arrest." He testified that although two officers were present, he only remembered one climbing on top of him.

After he was handcuffed and stood up, Mr. Christie was taken to the police cruiser and placed in the back seat. He testified that Officer Prescott was the one who put him in the police vehicle, and that he got a clear look at him as he was being seated in the police cruiser. Up until that point, it had been too dark to see the faces of the officers present at the scene.

Mr. Christie testified that he was driven to the Waterbury Police Department in the back of a police cruiser with two police officers in front, Officer Prescott in the passenger seat and another driving. Mr. Christie testified that when they arrived at the police station, he told Officer

5

Prescott, "my head is busted open. I'm bleeding," but that Officer Prescott ignored his request for medical attention.

Once Mr. Christie was booked at the Waterbury Police Department, he was held for five or six hours before being taken to the hospital. Although he said he repeatedly called out for help, he was left in the cell. Further testimony revealed the effects that the encounter had on Mr. Christie. Shortly before his morning court appearance, he was taken to St. Mary's Hospital in Waterbury, Connecticut, where he told the nurse that he did not know "why I got beat like this" and that he was thinking about killing himself. At St. Mary's, the staff cleaned and stapled his wound. They also suggested he seek some kind of therapy, which he later did in jail and was prescribed anti-depressants because of post-traumatic stress. He continues to take this medication today.

Mr. Christie testified that he continues to suffer after-effects from the beating. He showed the one-inch scar that runs horizontally along his skull above his left ear. Mr. Christie testified that he suffers from headaches as a result of the beating. In addition, he testified to psychological trauma. As a result of the beating, he has nightmares and is now terrified of the police.

Mr. Christie's testimony manifested his shock at having been beaten by a police officer, which had never happened to him before. He testified that the senselessness of the beating—the fact that he had been beaten for no reason—made him feel "dehumanized," as if he were not a "total human being." Mr. Christie distinguished this beating at the hands of police from other fistfights he had been in throughout his life because of its senselessness. He could not understand why he had been beaten.

Mr. Christie was subject to robust cross-examination during which both his recollection of events and his ability to identify who had assaulted him were challenged. On cross, Mr. Christie emphasized that he had been doing nothing suspicious as he walked to the 7-Eleven. He was not

6

screaming or making any noise, and he was not cursing or saying anything. He explained that he could not have been the cause of the complaint because he was not anywhere near the apartment complex where the complainant lived. Defense counsel challenged Mr. Christie's assertion that he was assaulted by only one police officer by asking if he said something different during deposition. Mr. Christie clarified that he recalled two officers on the scene, but that only one climbed on top of him.

Defense counsel challenged Mr. Christie's ability to identify Officer Prescott. Mr. Christie admitted that he "could see nothing for miles. . . . It's really black outside." Nonetheless, he was able to identify Officer Prescott as the officer who beat him because he saw his face when he was placed in the police cruiser after the arrest. "I remember his face, when we got in the car, and he puts me inside of the car." Mr. Christie also explained that he was able to identify Officer Prescott because Officer Prescott escorted Mr. Christie through the booking procedure at the Waterbury police department.

### 3. Defendant Officer Prescott's Account

In contrast to Plaintiff's suggestion that there were two police officers in the police car, Defendant testified that he was alone in his cruiser on the night of October 30-31, 2011. Officer Prescott explained that he saw "a male, walking, fitting the description" and so he pulled up to speak with him. Officer Prescott never explained what that description was, and he never explained how he identified Plaintiff on the unlit street as the suspect.

Officer Prescott testified that, after he spotted Mr. Christie, he pulled up and stepped out of the police car to ask him some questions. Officer Prescott testified that he spoke to Mr. Christie over the hood from twenty or twenty-five feet away. Officer Prescott asked his name and asked to speak to him but instead of a response, Mr. Christie only looked at him with a blank stare. Officer

Prescott thought that Mr. Christie looked "kind of out of it, like he was possibly intoxicated or on some type of drug."

Officer Prescott testified that Mr. Christie then turned and began running down the street away from the police car. Defendant was unspecific about what Mr. Christie looked like while running, except that "he was basically stumbling, because his pants were falling down, and he did not put his arms out or anything to try and stop his fall.  So he kind of went into the snow, just, I don't know if you'd say shoulder first, head first . . . ."

Notwithstanding Mr. Christie's alleged intoxicated state and impaired gait, Defendant's testimony was that he managed to run fifty or sixty yards before falling, outrunning Officer Prescott. Officer Prescott set off after Mr. Christie as soon as he started running, but only caught up to him because he tripped and fell into a snow bank. As he ran, he yelled at Mr. Christie, ordering him to stop.

Officer Prescott testified that Mr. Christie did not fall in the street, but rather sideways into a two-foot high mound of snow piled up between two parked cars. When he ran up to Mr. Christie, he found him lying face down in the snow pile with his hands tucked beneath his torso. Officer Brian Brunelli did not arrive on the scene until after Officer Prescott had begun chasing Mr. Christie, and once he arrived, he helped subdue Mr. Christie. Officer Prescott stated that he tried to grab Mr. Christie's hands but that he needed Officer Brunelli's assistance to get both arms out so that he could put the handcuffs on Mr. Christie.

After they handcuffed him, Officers Prescott and Brunelli stood Mr. Christie up. Despite the poor lighting conditions and the fact that they were fifty or sixty yards beyond the parked police cruiser, Officer Prescott testified that he noticed that Mr. Christie was bleeding from a cut on his head. In his testimony, he minimized the severity of the cut as "more of a scratch. . . . I did not

believe it to be a cut." He stated that Mr. Christie did not request medical treatment, noting that departmental policy dictates that any arrestee who requests medical treatment must first be taken to the hospital for treatment and only afterward brought to the station to be booked. At some point after the officers handcuffed Mr. Christie, they patted him down and found powder cocaine, crack cocaine and two bottles of liquid later identified as formaldehyde. Officer Prescott testified that two other officers who later arrived on scene, Duncan and April, drove Mr. Christie to the station for booking.

Officer Prescott stated that he never struck Mr. Christie, either with his fist or with an object. Nor did he ever see Officer Brunelli strike Mr. Christie. Officer Prescott also testified that he never tackled Mr. Christie. Rather, when asked if the only force he exerted was in grabbing Mr. Christie's hands to handcuff him, Officer Prescott said yes.

    4. **Documentary Evidence**

Mr. Christie introduced a set of medical records from his admission at St. Mary's Hospital (Pl.'s Ex. 1), an incomplete set of clinical records from his visits to the Connecticut Department of Correction Correctional Managed Health Care through the University of Connecticut Health Center (Pl.'s Ex. 2), and a photograph of the left side of Mr. Christie's scalp taken at Plaintiff's deposition in 2016. (Pl.'s Ex. 3).

Plaintiff's Exhibit 1, a signed "Emergency Department Physician Record," indicates that Mr. Christie was seen at approximately 5:50AM on the morning of October 31, 2011. The attending physician described the "history of the present illness" as "H/A and laceration to L scalp 'after the police beat' him up reportedly w/a night stick. . . . dizziness and blurry vision." Mr. Christie's pain level was recorded as "8/10." The attending physician gave a diagnosis of "scalp laceration" and that indicated that the treatment included "3 staples." (Pl.'s Ex. 1.) The second and third pages of

9

Pl.'s Ex. 1 reveal that Mr. Christie was given a CT scan without contrast, but showed that the results were negative.

Plaintiff's Exhibit 2 is an incomplete excerpt from Mr. Christie's medical chart as maintained by the Connecticut Department of Correction. The third page of the Exhibit contains the "Intake Health Screening." The second question in part 1 asks if the "inmate shows signs of . . . obvious pain/bleeding/trauma," to which the doctor circled "yes." He circled "no" for every other entry except the one concerning controlled substances, which was left blank, presumably because Mr. Christie was never tested for drugs or alcohol.  This form was filled out at 2:30PM on October 31, after Mr. Christie had been seen at the emergency room.

The first and second pages of Pl.'s Ex. 2 are comprised of notes taken by different clinicians who met with Mr. Christie.  Each block of notes is accompanied by a date and time.  On October 31 and November 1, 2011, the treating physician quoted Mr. Christie as saying, "I'm thinking about killing myself after the way the police beat me up." (Pl.'s Ex. 2 at 2.) This assertion—that Mr. Christie was thinking about killing himself—appears multiple times in the document. The initial intake form was marked "SI" in the mental health category, presumably an abbreviation for suicidal ideation. (Pl.'s Ex. 2 at 4.)

The notes clearly indicate that Mr. Christie had a laceration on the side of his head. However, in places they also state that Mr. Christie had "no complaints" and that he "rested quietly during the night. No issues voiced." (Pl.'s Ex. 2 at 2.)  In late January, 2012, Mr. Christie continued to report a head injury causing headaches. On January 26, 2013, he stated that it was "hard to sleep where staples were" and reported dizziness and drowsiness.  Three days later, he stated that "my head is crazy from when the police beat me down."  On February 2, 2012, the University of Connecticut clinician who took the notes reported that "I/M [inmate] reports altercation w/ police

upon arrest. Reports possible head trauma. Seen at St. Mary's," and added, seemingly gratuitously, "I/M trying to make lawsuit. Informed I/M no evidence of acute symptoms." (Pl.'s Ex. 2 at 1.)

Defendant introduced Mr. Christie's booking photo (Def.'s Ex. A), which shows both a full-face and profile view of Mr. Christie, but unhelpfully from only the uninjured, right side of the skull. In the full-face view, the wounded area is cast in shadow.

Defendant submitted two additional pages that came from Plaintiff's medical file and supplemented the incomplete exhibit Plaintiff had submitted: one page of notes from Mr. Christie's medical file at the Department of Correction facility (Def.'s Ex. F) and a further page of notes from that file (Def.'s Ex. G). These notes report Mr. Christie's complaints of symptoms related to high blood pressure in the days following his arrest. They also reveal that Mr. Christie was "very argumentative" and that he wanted to call his family (Def.'s Ex. G) and state that Mr. Christie reported using cocaine at some point in the days preceding his arrest (Def.'s Ex. F).

## II. Discussion

Plaintiff seeks recovery under 42 U.S.C. §§ 1983 and 1988 for violation of his Fourth Amendment rights, claiming that Defendant Jason Prescott, while acting under color of law, used excessive force during an arrest on October 31, 2011, when he struck Plaintiff in the head with an object.

### A. Legal Standard

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. This Fourth Amendment protection is violated when police use excessive force to arrest a person. *See, e.g. Graham v. Connor*, 490 U.S. 386, 394 (1989) (holding that an excessive force claim arising out of an arrest or investigatory stop is governed by Fourth Amendment protections). Nonetheless,

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (citing *Graham*, 490 U.S. at 396.)

The degree of force permissible is to be determined by a reasonability analysis. A "[p]olice officer's application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 397). *Graham* articulated three factors that should be taken into account when considering the totality of the circumstances: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Rogoz*, 796 F.3d at 246 (quoting *Graham*, 490 U.S. at 397).

Plaintiffs have the burden of proving all the elements of a section 1983 claim by a preponderance of the evidence. *Nimely v. City of New York*, 414 F.3d 381, 390 (2d Cir. 2005); *see generally* S. Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983* § 3.4 (4d ed.1998). "The term 'preponderance' means that upon all the evidence the facts asserted by the plaintiff are more probably true than false." *Nissho-Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir. 1983). Because Plaintiff bears that burden, "when the evidence on an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante,* 94 F.3d 53, 55 (2d Cir. 1996). Here, Plaintiff was required to establish that his version of the confrontation was more probable than not. Failure to do so, inluding if the evidence balances evenly between the parties, translates into a failure to carry the burden of proof.

12

The determinative issue in this case is whether Plaintiff proved that Officer Prescott struck him in the head in the course of arresting him. Officer Prescott did not deny that he climbed on top of Mr. Christie in order to handcuff him, and he did not deny that he applied force to pull his arms from beneath him, but the Plaintiff did not predicate his excessive force claim on this part of the arrest. Rather, that claim is predicated on the laceration to Plaintiff's skull. Neither party denied that Mr. Christie's scalp was cut open and neither party denied that it required three staples to close the wound. The laceration to Mr. Christie's scalp, however, does not speak for itself. Critically, its existence is not evidence of what caused it, a blow by a billy club or the hardened edge of snow or ice protruding from a snow pile. To make this determination, the Court must weigh the evidence, a task to which it now turns.

### B. Findings of Fact and Conclusions of Law

The Court adopts as findings of fact those facts described above that were not contested by the opposing party. With respect to the competing versions of what occurred during the arrest, the Court concludes that both parties' accounts were undermined by inconsistencies and internal tensions, leaving the evidence of liability in equipoise.

The internal inconsistencies in Officer Prescott's testimony, coupled with an inexplicable lack of detail, undermined his credibility. Officer Prescott never described in any detail the citizen complaint he received. He did not describe the suspect or explain how he recognized Mr. Christie as matching that description from a distance on unlit streets. He did not explain how long he searched for the suspect or how far he was from the apartment complex when he spotted Mr. Christie. Finally, though the complaint appears to have concerned a person who was making a loud disturbance on the street, Officer Prescott did not state that Mr. Christie was making any noise or causing a disturbance.

One central tension in Officer Prescott's testimony arose through his conflicting descriptions of Mr. Christie as, on the one hand, "out of it" and possibly high, and on the other as agile and a quick runner who "took off" instead of answering questions. It is hard to understand how a man described as out of it, stumbling, and as having difficulty walking because his pants were falling down could also run fifty or sixty yards without Officer Prescott—sober and on duty—catching up to him. Further, if Defendant's lack of memory was causing the lack of detail, he never asked to refer back to his incident report to refresh his memory. And although the Court draws no inference from the absence of testimony by Officer Brunelli—since he was available by subpoena to both parties—the Court found it surprising that Officer Brunelli did not appear to testify concerning the arrest which he witnessed.

Despite Mr. Christie's obvious attempts at candor—marked by his willingness to admit details that might harm his claim—his account of the arrest, standing on its own, was likewise undermined by lack of detail and improbabilities. For example, the Court found it unexplained how the "screech of tires" Plaintiff described could have occurred given the snowy conditions and Defendant proceeding at 'search' speed. Mr. Christie initially claimed that everything took place at once and that the police did not say anything to him before tackling him, but later conceded that he might have been told not to move, and that he might have heard someone say "get on the ground" or "you're under arrest." The fact that Mr. Christie had drugs on him at the time he was about to be confronted by Defendant provided him motive to get away and thus the Court found it unlikely that Mr. Christie was tackled without warning or without at least turning to run away.

The medical records only state that the wound was a laceration to the left scalp. (Pl.'s Ex. 2.) There was no mention of bruising or a raised welt or other evidence consistent with multiple blows as Plaintiff described. (*Id.*) There was no evidence of possible causes consistent with, or

14

inconsistent with the laceration found. (*Id.*) When Mr. Christie was seen by a doctor, the doctor noted that Mr. Christie showed obvious signs of pain/bleeding/trauma, had a pain score was marked at 8/10, and required three staples to close the wound on the left side of his skull. (*Id.*) Without the attending physician to read the medical records (many of which were written with unexplained abbreviations and shorthand), the Court could not determine whether the records supported Mr. Christie's account or Officer Prescott's.

In weighing the parties' accounts, the Court considered the location of the laceration on Plaintiff's skull, the lack of medical records or testimony by Plaintiff about other injuries in the surrounding area of his skull, and the likelihood that Plaintiff would have had other abrasions or cuts from a fall or struggle. With these issues in mind, neither party's account of how Mr. Christie's scalp was cut was more likely than not. Officer Prescott's assertion that Mr. Christie cut the left, rear side of his head when he fell shoulder-first into a pile of snow lacked initial plausibility because the wound was at the rear of his skull and because it was questionable whether plowed snow could open a wound like that, but this implausibility was somewhat lessened by testimony during trial of a later incident in which Plaintiff suffered bruising and a contusion to the same area of his skull after being tazered and falling forward onto the ground. Moreover, the undisputed testimony that the snow pile was composed of detritus from a passing snow plow makes it plausible that there were chunks of ice in the pile and that the pile itself was hard and unforgiving. Absent any medical testimony on causation, the Court was left to speculate about whether Mr. Christie's wound was consistent with being cut by hard-packed snow or protruding ice, or by blows from another "hard object." Similarly, nothing can be found in the medical records to tie Mr. Christie's wound more closely to one or the other potential cause.

On the evidence presented to the Court, fairly weighed, it is just as likely that the police, unprovoked but looking for a man who caused a disturbance, stopped Mr. Christie, tackled him, and struck him in the head with a blunt object, perhaps to loosen his grip so that they could handcuff him, as it is that Mr. Christie, knowing that he had crack cocaine, powder cocaine and formaldehyde on his person, ran from the police, slipped on the snow and ice and cut open his skull as he fell onto a pile of detritus pushed up by the snow plow.

There is no need for a legal analysis of the elements of Plaintiff's § 1983 excessive force claim because it is predicated on a factual issue for which Plaintiff has not carried his burden of proof. While neither party contests that Defendant was acting under color of law when he arrested Plaintiff, there has not been a showing by preponderance of the evidence that Defendant struck Plaintiff in the head during the course of that arrest.

For the foregoing reasons, the Court finds that Plaintiff has not satisfied his burden of proving his case by a preponderance of the evidence. Judgment is entered in favor of the Defendant and the Clerk is requested to close the case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of December 2016.